UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD L.,[1] | ) |
| | ) No. 20 CV 7335 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| KILOLO KIJAKAZI, Commissioner of Social Security, | ) |
| | ) |
| | ) May 26, 2023 |
| Defendant. | ) |

**MEMORANDUM OPINION and ORDER**

Ronald L. seeks disability insurance benefits ("DIB") asserting he is disabled by various medical conditions, including multiple sclerosis ("MS"), brain fog, long- and short-term memory loss, focus and cognitive issues, hand tremors, weakness and fatigue, and balance issues. He brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security denying his application for DIB. Before the court are cross motions for summary judgment. For the following reasons, Ronald's motion is granted, and the government's is denied:

**Procedural History**

Ronald filed a DIB application on January 24, 2019, alleging disability onset beginning on January 19, 2019. (Administrative Record ("A.R.") 17). At the administrative level, his application was denied initially and upon reconsideration.

---

[1] Pursuant to Internal Operating Procedure 22, the court uses Plaintiff's first name and last initial in this opinion to protect his privacy to the extent possible.

(Id.) Ronald appeared with his attorney telephonically at his May 2020 administrative hearing, during which he and a vocational expert ("VE") testified. (Id.) The Administrative Law Judge ("ALJ") presiding over Ronald's application ruled in June 2020 that Ronald was not disabled. (Id. at 31.) The Appeals Council denied Ronald's request for review, (id. at 1), making the ALJ's decision the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Ronald then filed this lawsuit seeking judicial review, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 6).

## Analysis

Ronald argues that the ALJ's decision requires remand because: (1) the ALJ failed to support the residual functional capacity ("RFC") finding with substantial evidence; (2) the ALJ improperly assessed Ronald's subjective symptoms; and (3) the ALJ erred in assigning little or no weight to certain medical opinions.[2] (R. 17, Pl.'s Mem. at 7-8.) When reviewing an ALJ's decision, the court asks only whether the ALJ applied the correct legal standards and the decision has the support of substantial evidence, s*ee Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019), which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). This deferential standard precludes the court from

---

[2] Ronald also argues that he was "deprived" of a "valid administrative adjudicatory process" because the Commissioner's authority is "unconstitutional." (R. 17, Pl.'s Mem. at 15-16.) For reasons this court has recently explained, there is no merit to this argument, rendering further discussion unwarranted. *See Michele M. v. Kijakazi*, No. 20 CV 7749, 2023 WL 3479182, at *1-2 (May 16, 2023).

reweighing evidence or substituting its judgment for the ALJ's, allowing reversal "only if the record compels it." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (quotation and citation omitted). The ALJ must also "provide a 'logical bridge' between the evidence and his conclusions," *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021), providing enough detail "to enable a review of whether the ALJ considered the totality of a claimant's limitations," *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021). Having considered the record, the court finds that the ALJ failed to properly consider Ronald's subjective symptoms and daily activities, warranting remand.

### A. Subjective Symptom Assessment

Ronald argues that in assessing and discounting his symptoms, the ALJ placed too much weight on his ability to carry out certain daily activities without recognizing the assistance he requires or severe challenges he experiences when completing them. (See R. 17, Pl.'s Mem. at 15.) When assessing a claimant's subjective reports, an ALJ considers: (1) objective medical evidence; (2) daily activities; (3) frequency and intensity of symptoms; (4) medication, treatment, and other measures to relieve pain or other symptoms; and (5) functional limitations. *See* SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). An ALJ's symptom evaluation is generally entitled to great deference because she observed the claimant's credibility firsthand. *See Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014). As such, a court will not disturb the evaluation if it is based on specific findings and evidence and not

3

"patently wrong"—that is, so long as it does not "lack[] any explanation or support." *Id.* at 815-16 (citing *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008)); *see also Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (stating that court's review of ALJ's symptom assessment is "extremely deferential").

The ALJ analyzed Ronald's daily activities when considering his "broad functional areas of mental functioning" and the reliability of his treating physicians' opinions. (A.R. 21-22.) In discussing Ronald's ability to interact with others, the ALJ found only mild limitation because he spends time with his children, shops in stores, and has "no trouble getting along with authority." (Id. at 21.) The ALJ also cited objective information undermining Ronald's reports that he was forgetful and had excessive difficulty with completing tasks, (see, e.g., id. at 263, 275, 282), including provider notes revealing Ronald "answered questions without any issues," demonstrated thought processes of "average speed, intact coherence, and normal flexibility," was "consistently" "alert and oriented" with his "verbal expression and comprehension . . . intact," and exhibited "normal recent and remote memory," (id. at 21 (internal citations and quotation marks omitted)).

When discussing Ronald's ability to concentrate, persist, or maintain pace, the ALJ considered Ronald's complaints that he is easily frustrated, has a limited ability to sustain attention, and difficulty finishing tasks he begins, (see, e.g., id. at 263, 275, 282), but she countered with Ronald's testimony indicating he can perform household chores, shop for household items weekly, and manage his family's finances, (id. at 22). Although the ALJ acknowledged Ronald's need for reminders

4

in completing household and self-maintenance tasks, she found Ronald capable of adapting or managing himself because he could "spend his days caring for 3 babies" in addition to preparing his own meals and managing finances. (Id.) Further, at his March 2019 psychological consultative examination, the consultant described Ronald's grooming as "adequate" and his judgment as "reliable," and highlighted Ronald's report that he could complete his activities of daily living and had adequate domestic skills. (Id. (internal citations omitted).)

In analyzing Ronald's challenges in these areas, the ALJ acknowledged his subjective symptom and daily activities descriptions, as well as those from his wife and mother, and analyzed them against contrary evidence in the medical record. Because she performed the requisite analysis, and because no portion of it is "patently" wrong in that it does not "lack[] any explanation or support," this court defers to the ALJ's conclusion and finds no error in her analysis of Ronald's mental functioning. *See Murphy*, 759 F.3d at 815-16 (internal citations omitted).

The ALJ also considered Ronald's daily activities when analyzing the alleged intensity, persistence, and limiting effects of his MS-related symptoms. While the ALJ accepted that Ronald's shoulder pain necessitated restrictions on how much weight he could support vocationally, she concluded that his caretaking activities "support[] the assertion that [Ronald] is not incapable of such a level of exertion." (A.R. 25.) Similarly, the ALJ discussed Ronald's complaints of hand tremors when using a spoon to feed his children, a symptom he also discussed with treating neurologist, Dr. Matthew McCoyd. (Id. at 26; see also id. at 710.) Dr. McCoyd's

5

treatment notes indicate that spasticity did not improve with the use of Baclofen and that Ronald stopped taking Acyclovir. (Id. at 710.) Finally, the ALJ discussed Ronald's physical therapy notes, which showed improved balance while walking with head turns and an ability to descend stairs without losing balance, even though his attendance at therapy was inconsistent. (Id. at 27 (citing id. at 995).)

Ronald argues that the ALJ improperly equated his ability to care for his children with being able to sustain full-time employment. (R. 17, Pl.'s Mem. at 15.) The Seventh Circuit cautions against this precise conclusion, *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014), and has found that "minimal daily activities" such as preparing simple meals and grocery shopping, "do not establish that a person is capable of engaging in substantial physical activity," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Although an ALJ's "unrealistic and exaggerated reliance upon" childcare can result in reversal, the Seventh Circuit has confirmed that "[s]uch evidence of daily activities is relevant . . . [and] can be helpful in evaluating conflicting evidence about a person's limitations." *Chambers v. Saul*, 861 Fed. Appx. 95, 101 (7th Cir. 2021).

The government argues that the ALJ did not claim that Ronald's daily activities, including caregiving, evidenced his ability to work but rather that she "used them to assess whether [Ronald's] testimony about the significant limitations he suffered were consistent with the evidence or exaggerated." (R. 23, Gov.'s Mem. at 23.) The court agrees in part because as discussed, the ALJ considered Ronald's caretaking activities against evidence demonstrating his physical capabilities and

6

improvements. The ALJ failed, however, to evaluate Ronald's alleged lassitude symptoms. Indeed, Dr. McCoyd noted that Ronald's "fatigue [i]s the kind described as lassitude rather than fatigue of motor functions and [i]s the type generally associated with MS." (R. 17, Pl.'s Mem. at 12 (citing A.R. 562).) Lassitude "[t]ends to worsen as the day progresses," "[c]omes on easily and suddenly," "[i]s generally more severe than normal fatigue," and is "more likely to interfere with daily responsibilities." Pittsburgh Inst. for Multiple Sclerosis Care & Research, *Fatigue & Lassitude*, UNIV. OF PITTSBURGH, https://www.ms.pitt.edu/symptom-management/fatigue-lassitude (last visited May 25, 2023). Importantly, lassitude "does not appear to be directly correlated with either depression or the degree of physical impairment." *Id.*

Ronald explained in his function report that although he cares for his three toddlers, he needs to rest for 30 to 45 minutes after preparing and cleaning bottles and changing diapers. (A.R. 285.) His mother stated that Ronald sometimes cannot lift himself up to stand after sitting on the ground to play with his children. (Id. at 275.) Regarding Ronald's once-a-week shopping for groceries and household items, which take him two to three hours to complete, (id. at 280), he needs to rest for approximately 45 minutes after carrying the groceries, (id. at 285), and he relies on the grocery cart for stability, (id. at 281). Finally, while it is true that Ronald makes simple meals for himself, such meals consist of cereal, pizza, sandwiches, or frozen dinners, and after preparing them for 5 to 25 minutes he must rest. (Id. at 279.) This evidence shows that the ALJ failed to grapple with Ronald's complaints

of severe fatigue unique among those suffering from MS and that are supported by the objective medical record. (See, e.g., id. at 711-12.) On remand, the ALJ must consider whether Ronald's subjective complaints of lassitude are supported by the medical record, *e.g.*, MRI results and provider notes, and reassess his RFC accordingly.

## B. Opinion Evidence

Ronald asserts that the ALJ improperly substituted her own lay judgment for the opinions of state agency psychologists and Ronald's treating neurologist, Dr. McCoyd. (R. 17, Pl.'s Mem. at 7.) He argues that in doing so, the ALJ improperly relied on his statements regarding his daily activities, cherry picked medical evidence, and failed to adequately support her findings. (Id.)

Ronald filed his claim after March 27, 2017, meaning that the ALJ no longer affords "specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from [the claimant's own] medical sources." *Marc Y. v. Kijakazi*, No. 20 CV 7601, 2023 WL 2751120, at *7 (N.D. Ill. March 31, 2023) (citing 20 C.F.R. § 404.1520c(a)). Under this updated standard, the most important factors in evaluating any medical provider's opinion are "supportability" and "consistency." *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022); 20 C.F.R. § 404.1520c(a). Other factors for consideration include the provider-claimant relationship and the provider's specialization. 20 C.F.R. § 404.1520c(c). While ALJs must "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical

8

findings," they are not required to explain how they considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

The ALJ adequately explained her decision to deem the state agency opinions as "not persuasive." (See A.R. 28.) The state agency psychological consultants found Ronald capable of "no more than simple routine tasks, routine workplace changes, no fast-paced work with production quotas, no more than occasional contact with supervisors and co-workers, and no more than incidental contact with the general public." (Id.) The ALJ reasoned that these mental assessments were inconsistent with the "minimal abnormalities" reflected in the medical record and with Ronald's ability to serve as primary caregiver to his children, interact with others, and "us[e] a cellular telephone to access information about his impairments." (Id. at 28.) More specifically, the ALJ noted that although Ronald reported that he is "very forgetful with spoken directions" and needs reminders to take medication or to finish tasks, (id. at 21 (citing id at 277, 293, 296)), the medical records show that even when he reported worsening cognition during a March 2019 psychological consultative examination, (id. (citing id. at 411)), his providers found him to have thought processes of "average speed, intact coherence, normal flexibility albeit with some mild rumination," and noted that he exercised reasonable judgment, used abstract reasoning, and had "adequate" immediate and short-term memory function, (id. at 21). Further, the ALJ cited to Ronald's treating neurologist's notes, which consistently described him as "alert and oriented" with "intact" verbal expression and comprehension, (id. at 21 (citing id. at 419, 581,

9

922)), and to treatment records from early 2020, which "consistently noted logical and goal-directed thought processes," (id. at 21 (citing id. at 910)). Finally, the ALJ cited evidence that Ronald interacted positively with others, lacked a need for redirection or refocusing of attention during psychological examinations, cared for his three toddlers, and read articles regarding his medical condition. (Id. at 22, 28.) The court is not endowed with the power to reweigh evidence the ALJ reviewed. *See Beardsley*, 758 F.3d at 836-37. As such, and because the ALJ more than minimally articulated her reasons for concluding that the state agency psychological consultants' opinions were inconsistent with and unsupported by the medical record, the court finds no error here.

However, Ronald's arguments regarding the ALJ's evaluation of treating neurologist Dr. McCoyd's opinions are largely meritorious. Dr. McCoyd opined in August 2019 and January 2020 that Ronald was:

> physically and mentally incapable of sustaining even sedentary work, requiring, among other things, repeated breaks, recurrent absences in excess of four times per month, and less than occasional postural and manipulative activities with a noted 'inability' to manipulate objects, use fine dexterity, [] sustain motor power, and tolerate even a low-stress job.

(A.R. 563-67, 803-05, 807.) The ALJ also found Dr. McCoyd's opinions "not persuasive" because they conflict with Ronald's ability to serve as primary caregiver for his three toddlers, his self-reported daily activities, and the objective medical findings. (Id. at 28.) But, as discussed, the ALJ failed to evaluate the impact of Ronald's documented lassitude symptoms on his ability to care for his children and perform other domestic tasks. (See id. at 562, 803.) The ALJ also took issue with

10

the fact that Ronald saw Dr. McCoyd approximately every six months and not more frequently. (Id.) While seeing a patient infrequently can inform an ALJ's decision to afford the opinion non-controlling weight, it cannot reasonably support a conclusion that an opinion is not persuasive as the ALJ found here. *See Constance v. Saul*, 389 F. Supp. 3d 538, 590 (N.D. Ill. 2019). The ALJ must address both points when reconsidering Dr. McCoyd's opinions on remand.

The ALJ found Dr. McCoyd's April 2020 opinion that "he expects [Ronald's] condition to worsen," (A.R. 28 (citing id. at 1020)), to be "speculative" and at odds with Ronald's recent improvement through physical therapy, (id.) But although Ronald made good progress in terms of balance and gait during physical therapy, such progress does not speak to his struggle with lassitude, and the ALJ failed to explain how the "relapsing and progressive" nature of Ronald's MS should be considered in conjunction with his progress with physical therapy. (Id. at 567); *see also Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability."). Nor did the ALJ explain why she deemed this opinion "speculative." Dr. McCoyd cited to objective medical facts in stating that Ronald's MS would negatively progress, namely that Ronald's MRIs demonstrated "high lesion load with extensive white matter changes and numerous 'T1 black holes' (focal areas of brain atrophy/loss)" and "a very significant lesion volume, particularly in light of his age and duration of disease." (Id. at 1020.) Dr. McCoyd arrived at this conclusion even though Ronald "ha[d]

11

been compliant with all treatment recommendations and proactive in his care." (Id.) On remand, the ALJ must build a logical bridge between this evidence and her conclusion regarding the weight to afford Dr. McCoyd's opinions.

Finally, the ALJ discounted Dr. McCoyd's December 2018 opinion that Ronald "may not complete certain essential job functions" and that his "[g]eneral restrictions due to MS include working from heights and trying to minimize working in high temperatures," (id. at 29 (citing id. at 806)), because "it was rendered prior to the period at issue," (id.). "[T]he regulations do not require the evidence to be created after the application date," and because "[e]vidence of progressive diseases or long-term medical issues may exist prior to the application date," "this evidence may be relevant to future time periods" and thus must not be discounted. *Hart on behalf of JMH v. Kijakazi*, No. 21 CV 462, 2022 WL 3053937, at *2 (N.D. Ind. Aug. 3, 2022). But because the ALJ incorporated the subject limitations in the RFC, this error is harmless.

**C.   RFC Assessment**

Although the ALJ must revisit Ronald's RFC, the addresses his RFC arguments for the sake of completeness. Ronald claims that the ALJ failed to adequately support her RFC assessment because she came to a "compromised middle ground finding" after declining to adopt any of the opinion evidence and failed to "properly assess key evidence, particularly fatigue." (R. 17, Pl.'s Mem. at 7.) Ronald's RFC arguments are of mixed merit.

The RFC measures the tasks a person can perform given his limitations based in "all the relevant evidence" in the administrative record. 20 C.F.R. § 404.1545(a)(1); *see also Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). When assessing a claimant's RFC, the ALJ "must give substantial weight to the medical evidence and opinions submitted, unless specific, legitimate reasons constituting good cause are shown for rejecting it." *Chambers*, 861 Fed. Appx. at 101 (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). The ALJ may not engage in "impermissible cherry-picking" by "highlighting facts that support a finding of non-disability while ignoring evidence to the contrary." *Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020). Where the ALJ does not rely upon medical opinions, she must "thoroughly discuss[] the medical and other evidence carefully," "consider[] each of [the claimant's] impairments and related function deficits," and explicitly "describ[e] how the evidence supports each [RFC] conclusion." *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011) (citing SSR 96-8p); *see also Nina Joyce H. v. Saul*, No. 18 CV 4913, 2020 WL 212771, at *7 (N.D. Ill. Jan. 14, 2020).

Here, the ALJ concluded that Ronald can perform "sedentary work" with the following physical limitations:

> no climbing of ladders, ropes or scaffolds, operation of foot controls or motorized vehicles, kneeling, crouching, or crawling, or working around unprotected heights, open flames, or unprotected dangerous machinery; no more than occasional climbing of ramps and stairs, balancing, and stooping; no more than frequent handling and fingering bilaterally;[3] no concentrated exposure to extremes of heat or humidity; and which allows the accommodating use of a cane for walking.

---

[3] Ronald argues in a footnote that the limitation of "no more than frequent handling and fingering bilaterally" is inconsistent with the VE's hearing testimony

13

Ronald asserts that the ALJ created an "evidentiary deficit" by declining to rely on any of the medical opinions submitted and filled the resulting void with her lay opinions. (R. 17, Pl.'s Mem. at 11.) The court disagrees. After defining the RFC, the ALJ engaged significantly with the medical record, including with providers' treatment notes, letters submitted by Ronald, his wife, and his mother, and medical opinions from state agency medical professionals and Ronald's treating physicians. (A.R. 23-29.) After analyzing the evidence addressing Ronald's obesity, MS, physical therapy, and mental impairments, (id. at 21-27), the ALJ explained that Ronald's RFC is grounded in "evidence of [his] retained fine- and gross-motor function and improvement with the benefit of even intermittent adherence to treatment but mindful of his subjective complaints of fatigue, particularly with activity and in certain environments as well as the exacerbatory impact of his obese state," (id. at 27). By articulating the evidence supporting her RFC finding, the ALJ filled any dearth created in the absence of adopted medical opinions. *See Norris*, 776 F. Supp. 2d at 637.

But the court agrees with Ronald that the ALJ failed to properly consider his MS-induced lassitude when formulating his RFC. (R. 17, Pl.'s Mem. at 12.) The ALJ explained that she was "mindful of [Ronald's] subjective complaints of fatigue, particularly with activity and in certain environments," but did not accept Ronald's

---

that, according to Ronald, all sedentary jobs compliant with the RFC's present limitations require constant handling and fingering. (R. 17, Pl.'s Mem. at 15.) Ronald misunderstands the testimony. Although the VE initially opined to this effect, the VE later clarified that certain positions (e.g., a surveillance system monitor) would require no more than frequent handling and fingering. (See A.R. 73-77.)

14

allegation of "being easily fatigued" because she found it to be inconsistent with the record evidence. (A.R. 27.) The ALJ then extensively discussed Ronald's daily activities, physical therapy notes indicating improvement in gait and balance, and provider notes stating that Ronald's motor function and strength were normal, (id. at 29-32), and appears to have accounted for Ronald's alleged fatigue by limiting his RFC to "sedentary work" and including various physical restraints, (id. at 23). But she failed to account for lassitude in the RFC analysis. A flawed RFC assessment will not justify remand unless the claimant can identify additional limitations not already included in the RFC. *See Pavlicek v. Saul*, 994 F.2d 777, 784 (7th Cir. 2021); *Jozefyk*, 923 F.3d at 498. Ronald satisfies that burden here by pointing out that the RFC "does not include any accommodation for fatigue such as extra breaks or time off task." (R. 17, Pl.'s Mem. at 12.) On remand, the ALJ must consider lassitude and examine whether additional limitations are warranted.

Finally, Ronald argues that the ALJ provided no explanation as to how she was "mindful" of "the exacerbatory impact of [Ronald's] obese state" in determining his RFC. (Id. at 13.) The ALJ explained that she considered the impact of Ronald's obesity with his "comorbid neurological impairment and its symptoms, particularly with their impact on coordination, balance, and stamina," and her sedentary RFC including the physical restrictions noted above. (Id. at 28-29.) However, this circuit has found deficiencies in logic where claimants with "severe" obesity are deemed able to "occasionally" climb, balance, and stoop. *See, e.g., Constance*, 389 F. Supp. at 589 (discussing *Goins v. Colvin*, 764 F.3d 677, 682 (7th Cir. 2014)). Without

15

explaining how Ronald is capable of these activities—particularly given evidence that he at times cannot raise himself from the ground after playing with his children, (A.R. 275), relies on his grocery cart for balance while shopping, (id. at 281), and has experienced falls because of poor balance, (id. at 263)—the court cannot follow the ALJ's logic that Ronald can occasionally climb, balance, and stoop. As such, the ALJ must also revisit this issue on remand.

## Conclusion

For the foregoing reasons, Ronald's motion for summary judgment is granted and the government's is denied.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**